UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROSE CARTER, as Administrator
of the Estate of Salladin Barton,

              Plaintiff,

    -v-                                      9:16-CV-422

BROOME COUNTY,
DAVID HARDER, Sheriff,
Broome County, MARK
SMOLINSKY, Administrator;
Broome County Jail,
CORRECTIONAL MEDICAL
CARE, INC., EMRE UMAR,
President, Correctional
Medical Care, Inc., MARIA
CARPIO, Chief Executive
Officer, Correctional Medical
Care, Inc., JOHN DOES 4-6,
Employees of Broome County
Sheriff's Department, MAHMOOD
BUTT, FLORANTE TINIO,
KATELYN CLAIRE, SHEENA
FENESCEY, and MORGANNE
SHUTE,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                   OF COUNSEL:

LAW OFFICES OF ELMER ROBERT        ELMER R. KEACH, III, ESQ.
   KEACH, III, P.C.                          MARIA K. DYSON, ESQ.
Attorneys for Plaintiff
One Pine West Plaza
Suite 109
Albany, NY 12205

| | |
|---|---|
| BROOME COUNTY ATTORNEY'S OFFICE<br>Attorneys for Defendants Broome County, David Harder, Mark Smolinsky, and John Does 4-6<br>Broome County Office Building<br>60 Hawley Street, P.O. Box 1766<br>Binghamton, NY 13902 | LEIA D. SCHMIDT, ESQ. |
| STEINBERG, SYMER LAW FIRM<br>Attorneys for Defendants Correctional Medical Care, Inc., Emre Umar, Maria Carpio, Mahmood Butt, Florante Tinio, Katelyn Claire, Sheena Fenescey, and Morganne Shute<br>27 Garden Street<br>Poughkeepsie, NY 12601 | ELLEN A. FISCHER, ESQ.<br>JONATHAN E. SYMER, ESQ. |

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

## I. **INTRODUCTION**

Plaintiff Rose Carter ("Carter" or "plaintiff"), administrator of the Estate of Salladin Barton ("Barton" or "decedent"), filed this 42 U.S.C. § 1983 action against defendants Broome County (the "County"), County Sheriff David Harder ("Sheriff Harder"), Broome County Jail Administrator Mark Smolinsky ("Administrator Smolinsky"), three John Doe officers employed by the County Sheriff's Office (the "Does"), Correctional Medical Care, Inc. ("CMC"), CMC President Emre Umar ("President Umar"), CMC Chief Executive Officer Maria Carpio ("CEO Carpio"), Broome County Jail (the "Jail") physician Mahmood Butt ("Doctor Butt"), Jail psychiatrist Florante Tinio ("Doctor Tinio"), and three Jail social workers: Katelyn

Claire ("LMSW Claire"), Sheena Fenescey ("LMSW Fenescey"), and Morganne Shute ("LMSW Shute").

Carter's six-count amended complaint alleges that these defendants violated Barton's Eighth Amendment rights while he was being held at the Broome County Jail (the "Jail"). In particular, plaintiff alleges that Doctor Butt, Doctor Tinio, LMSW Claire, LMSW Fenescey, and LMSW Shute (collectively the "medical defendants") were deliberately indifferent to several increasingly serious medical problems that led to decedent's untimely death (First Cause of Action). Plaintiff further alleges that the Does, security staff at the Jail, repeatedly tasered, pepper-sprayed, beat, and placed decedent in a restraint chair in response to behavioral problems that he manifested as a side effect of the inadequate medical treatment he repeatedly received (Second Cause of Action).

Carter also asserts a Monell claim against the County, Sheriff Harder, Administrator Smolinsky, CMC, President Umar, and CEO Carpio by alleging that these defendants knowingly implemented a policy of providing inadequate medical care to inmates at the Jail as a cost savings measure (Third Cause of Action). Finally, plaintiff asserts state law claims against all defendants for conscious pain and suffering (Fourth Cause of Action), against the medical defendants for wrongful death (Fifth Cause of Action), and against the Broome County defendants for assault, battery, emotional distress, and negligent supervision (Sixth Cause of Action).

The County, Sheriff Harder, Administrator Smolinsky, and the Does (collectively the "Broome County defendants") have answered Carter's complaint. However, on October 31, 2016, CMC, President Umar, and CEO Carpio (the "CMC defendants") moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) seeking to dismiss plaintiff's operative complaint for

failure to state any viable federal claims.[1]  Following several requests for extensions of time, the medical defendants also moved under Rule 12(b)(6) to dismiss plaintiff's complaint.  The motions have been fully briefed and will be decided on the basis of the submissions without oral argument.

## II. BACKGROUND[2]

Barton, a 37-year-old African-American male, arrived at the County Jail after being arrested in connection with an alleged robbery.  At the time of his admission, decedent weighed 180 pounds and he reported no history of physical or mental health problems.  Shortly after his admission to the Jail, however, decedent began exhibiting serious medical symptoms of increasing frequency, including violent seizures, suicidal ideation, episodes of self-harm, and episodes of delirium.

The crux of Carter's operative complaint is that medical staff at the Jail administered strong anti-psychotic and seizure medications to Barton, a man with no known history of seizures, without making any meaningful effort to supervise the dosage levels or monitor for side effects.  As a result, decedent's physical and mental health continued to worsen over a period of approximately eighteen months, leading eventually to his premature death.

The following chronology of events is gleaned from Carter's complaint as well as a partially redacted report from the New York State Commission of Correction attached as one of several exhibits.

---

[1] This motion was originally made on behalf of additional defendants, but the parties have since stipulated to their dismissal.

[2] The following allegations are taken from Carter's amended complaint and attached exhibits and are assumed true for purposes of resolving the motions to dismiss.

On June 10, 2013, Barton arrived at the County Jail. Decedent reported no history of physical or mental health problems, and a physical examination conducted by Jail staff appeared normal.

On July 8, 2013, Jail staff pepper-sprayed Barton after he caused a disruption and refused to comply. Among other things, decedent lunged at corrections officers and yelled that he wanted to hurt himself. Shortly thereafter, decedent was placed on constant watch after complaining of episodes of "blacking out and falling."

During February of 2014, Barton continued to experience episodes of passing out, and reported falling on three occasions. Doctor Butt, decedent's primary physician at the Jail, concluded that "this was not seizure activity" bur rather believed it to be "behavioral." Doctor Butt decreased decedent's dosage of Trileptal, an anti-epileptic drug, in response to his complaints of dizziness.

During March of 2014, Barton met with medical staff after he submitted sick call slips for seizures. Jail medical staff, including Doctor Butt, examined decedent four times. Again, however, Doctor Butt deemed this not to be seizure activity.

On April 9, 2014, Jail staff pepper-sprayed Barton and placed him in a restraint chair for causing a disruption and refusing to follow orders. Decedent was also seen by medical staff four times in April of 2014 "for various sick call requests." During May of 2014, Jail staff placed decedent in a restraint chair on two other occasions for causing disruptions.

On May 28, 2014, Barton requested that all his medications be discontinued and indicated to Jail staff that he planned to kill himself.

On June 1, 2014, Jail staff placed Barton in a restraint chair from 11:49 a.m. until 1:35 p.m. after he caused another disruption. Decedent twice refused efforts by medical staff to check his vital signs afterward.

On June 23, 2014, at 3:00 a.m., Jail staff pepper-sprayed Barton and placed him in a restraint chair after he caused another disruption. Decedent sustained a cut on his lip but refused medical care.

On July 20, 2014, Jail medical staff met with Barton after he complained of chest pain. Although decedent reported episodes of incontinence, medical staff concluded that there was no evidence of incontinence or cardiac issues and returned him to his cell.

On July 21, 2014, Barton indicated to Jail staff that he wanted to start taking his medications again, but also reported that he wanted to be placed in the Secure Housing Unit ("SHU").

On August 1, 2014, Jail medical staff met with Barton after he complained of a "high heart rate." After medical staff reassured decedent that his heart rate was normal, he was returned to his cell. Decedent submitted several more sick call slips the next day and was referred to Mental Health, including Doctor Tinio and the social workers.

On August 3, 2014, Jail medical staff met with Barton after he complained of "racing heart and increased nervousness." Decedent was again reassured that his medical assessment was normal but "became agitated by medical['s] response."

On September 14, 2014, Jail medical staff met with Barton after he complained of seizures. Decedent received laboratory testing, which came back mostly normal.

On at least two different occasions in late September or early October, Jail staff found Barton lying on the floor of his cell "making incoherent noises" or observed that he was

"nonverbal, and having jerking movements."  On both occasions, Jail staff observed blood coming from decedent's mouth.  On the second occasion, Doctor Butt assessed decedent and then returned him to his cell.

On October 11, 2014, Jail staff noted that Barton appeared to have a large bump and a cut over his right eye.  When decedent indicated that he was not aware what happened to his eye, Jail staff notified Doctor Butt, who ordered that decedent remain in the medical area for neurological observation.

At 9:40 p.m., Barton "screeched," lowered himself to the floor, and then "continued to twitch on the floor," while "breathing through his mouth with his teeth clenched."  Over the course of the evening, Jail staff reported that decedent engaged in increasingly bizarre behavior, such as "washing his face from the toilet."

On October 12, 2014, at 9:09 a.m., Jail staff sent Barton to Binghamton General Hospital to be evaluated for his overnight behavior, including his "seizure like activity" and "screeching."  The hospital discharged decedent, who was seen by Doctor Butt the next day.

On October 28, 2014, medical staff met with Barton after he placed a sick call slip indicating "black dots" and that he was "new to medication."  Medical staff determined there were no signs of seizures.

On October 30, 2014, Jail staff pepper-sprayed Barton for causing another disturbance.  A few days later, on November 2, 2014, decedent placed a sick call slip claiming "migraines, headaches, [and] seeing dots."  Jail staff placed decedent on Doctor Butt's sick call list.

In early November, Jail staff found Barton "lying on his back in his cell with blood on the floor and on the right side of his forehead."  Decedent became combative, "was

- 7 -

chanting," and "had to be carried to the wheelchair and wheeled to the medical area." Jail staff notified Doctor Butt, who decided that decedent should remain in the medical unit for observation. Around midnight, decedent "screeched and fell to the floor." Jail staff observed that decedent's body was "rigid and twitching" and "breathing hard and spitting white foam from his mouth."

On November 15, 2014, at 1:09 a.m., Jail staff observed Barton "jump into the air and hit his head on the wall" before falling to the floor of his cell. Jail staff observed that decedent's body was "rigid with some jerking movements of his hands and feet." Jail staff called an ambulance and notified Doctor Butt. In the emergency room, decedent "acted confused at times" and engaged in increasingly bizarre behavior. On the way back to the Jail, decedent "urinated all over the police vehicle."

On November 17, 2014, Doctor Butt met with Barton and determined that the above incident was "behavioral."

On November 20, 2014, Jail staff found Barton "having a questionable seizure," but he voiced no complaints.

On November 24, 2014, Jail staff found Barton on the floor of his cell in the medical unit. Decedent was unresponsive, but recovered quickly. Doctor Butt met with decedent, who noted no seizure activity and discharged decedent to his cell.

On November 27, 2014, Jail staff found Barton unresponsive. However, there was no evidence of seizures, so decedent was discharged to his cell.

On December 11, 2014, Jail staff sent Barton to Wilson Memorial Hospital after he suffered a "seizure with loss of consciousness and incontinence." The hospital admitted

decedent with a diagnosis of seizure, "status post head injury and hyponatremia," an abnormally low level of sodium in the blood.

On December 12, 2014, the hospital discharged Barton and he returned to the Jail. At the time of his discharge, decedent's medications were tylenol, an antacid, Trileptal, and Artane, a drug used to treat side effects of certain psychiatric drugs.

On December 15, 2014, Doctor Butt met with Barton to follow up on his hospital visit and then discharged decedent to his cell. It also appears that decedent met with Doctor Tinio, who "failed to recognize" his hyponatremia, a "known side effect of Trileptal," and "failed to initiate more intensive patient monitoring."

On December 22, 2014, Jail staff placed Barton on medical observation after they observed him "shaking" while he was sleeping. Doctor Butt met with decedent later that day before discharging him to his cell.

On January 2, 2015, Jail staff placed Barton on medical observation after he began "throwing himself around his cell and hitting his head." When Jail staff observed decedent have an "episode of shaking immediately after screaming," they notified Doctor Butt. Decedent's behaviors "continued throughout the night to include exposing his genitals, dropping on [the] floor shaking, then shortly after pacing in his cell. Decedent remained on medical observation the next day.

On January 4, 2015, Doctor Butt met with Barton and "had a normal physical exam." Decedent remained on medical observation for an additional day. After Doctor Butt conducted another exam with normal findings, decedent was discharged to his cell.

On January 14, 2015, at around 2:50 p.m., Jail staff observed Barton lying unresponsive on the floor of his cell. When Jail staff turned decedent onto his back, he

became pulseless. Jail staff began CPR and called an ambulance. Eventually, an ambulance crew arrived and transported decedent to the emergency room, where tests were performed. Decedent was pronounced dead in the emergency room approximately three hours later.

## III. LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere conclusions are required." Id. "Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." Id.; see also Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.). In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be

taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV. DISCUSSION

A review of the two pending motions to dismiss reveal that they are primarily aimed at defeating Carter's Eighth Amendment § 1983 claims.  For instance, both the CMC defendants and the medical defendants contend that the allegations in plaintiff's operative complaint do little more than describe ordinary negligence or careless treatment, the kind of complaints that fail to state an actionable constitutional violation.  Further, the CMC defendants insist that plaintiff has failed to plausibly plead a Monell claim because she has failed to plead a causal link between Barton's death and any policy attributable to CMC.

Carter, for her part, emphasizes in opposition that Barton had "numerous serious medical needs, including for epilepsy and for the side-effects causes by his mental health and seizure medication."  Plaintiff concedes that decedent repeatedly received medical attention from Jail staff but argues that the medical defendants consciously selected easier, cheaper, and less effective methods of treatment.  Plaintiff points out that decedent's death is "one in a pattern of deaths to emerge in facilities who have delegated their medical care" to the CMC defendants as a result of a deliberate pattern and practice of "providing substandard medical care, and utilizing untrained or poorly trained medical personnel."

"Historically, a § 1983 claim alleging deliberate indifference to a plaintiff's serious medical needs has been analyzed under a two-pronged standard." Hulett v. City of Syracuse, –F. Supp. 3d–, 2017 WL 2333712, at *13 (N.D.N.Y. May 30, 2017) (citing Williams v. Conway, 236 F. Supp. 3d 554, 582 (N.D.N.Y. 2017)).  "The first prong of this standard was objective: 'the alleged deprivation of adequate medical care must be sufficiently

- 11 -

serious.'" Id. (quoting Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 139 (2d Cir. 2013)). "The second prong was long understood to be subjective: 'the charged officials must be subjectively reckless in their denial of medical care.'" Id.

"Under this well-settled approach, it made no difference whether the plaintiff was a convicted prisoner or a pre-trial detainee, since the Second Circuit had repeatedly instructed lower courts that '[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.'" Hulett, 2017 WL 2333712, at *13 (quoting Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009)).

Recently, however, the Second Circuit has changed course. In Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017), the Court overruled in part Caiozzo, observing that the "subjective prong" of a § 1983 deliberate indifference claim asserted by a pre-trial detainee is "perhaps better classified as a '*mens rea* prong' or 'mental element prong.'" Id. at 29. Accordingly, the Court concluded that "deliberate indifference" in the Fourteenth Amendment context should be "defined objectively," meaning that the "Due Process Clause can be violated [even] when an official does not have subjective awareness that the officials acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id. at 35. In other words, rather than ask whether the defendant "kn[ew] of and disregard[ed] an excessive risk to [ ] health or safety," the appropriate inquiry under the Fourteenth Amendment is whether the defendant "knew, or should have known" that his conduct "posed an excessive risk to health or safety." Id. at 33, 35.

This doctrinal development poses a potential problem in this case, since it is unclear from Carter's operative complaint whether Barton had yet been convicted of a crime during

his period of incarceration at the Jail.  However, the applicability of this change in the law to decedent's circumstances is unnecessary to determine at this juncture.  Even applying the more demanding version of the two-pronged standard, plaintiff has stated plausible claims for relief.

"A claim for violations of the Eighth Amendment requires (1) an 'objectively sufficiently serious . . . denial of the minimal civilized measure of life's necessities' and (2) a 'sufficiently culpable state of mind' on the part of the responsible official."  Willey v. Kirkpatrick, 801 F.3d 51, 66 (2d Cir. 2015) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)).

The objective element requires a plaintiff to "show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013), which includes the risk of serious damage to one's "physical and mental soundness."  LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972).

Importantly, "there is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'"  Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).  As relevant here, prisoners may not be exposed "to conditions that 'pose an unreasonable risk of serious damage to [their] future health.'"  Id. (quoting Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).

The subjective element requires a plaintiff to show "that the defendant acted with more than mere negligence."  Farmer, 511 U.S. at 835.  "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'"  Walker, 717 F.3d at 125 (quoting Jabbar, 683 F.3d at 57); see also Lapierre v. Cty.

of Nassau, 459 F. App'x 28, 29 (2d Cir. 2012) (summary order) ("Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the equivalent of criminal recklessness").  For instance, "[e]vidence that the risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker, 717 F.3d at 125 (quoting Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003)).

As both sets of defendants point out, "a difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." Sonds v. St. Barnabas Hosp. Corr. Health Serv., 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  But taking as true the allegations in Carter's operative complaint, medical staff at the Jail continued to dispense strong medication that led to serious imbalances in the concentrations of certain substances in Barton's blood.  And despite the fact that decedent was repeatedly observed to be acting erratically and in ways that suggested such imbalances, various medical staff—who were put on notice of these behaviors over a significant period of time—allegedly failed to take appropriate action to prevent further harm, ultimately leading to his premature death.[3]

Carter has also sufficiently pleaded a viable Monell claim against CMC.  "Although Monell dealt with municipal employers, its rationale has been extended to private businesses." Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 409 (2d Cir. 1990); see also Powell v. Corr. Med. Care, Inc., 2014 WL 4229980, at *6 (S.D.N.Y. Aug. 15, 2014) (analyzing pro se plaintiff's Monell claim against CMC).

---

[3] In contrast to his numerous interactions with Doctor Butt, the complaint and attached exhibits do little to describe the particular acts or omissions that might be attributable to any of the three social workers.  Accordingly, this claim will be dismissed as against these defendants.

"Before a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" Carmichael v. City of N.Y., 34 F. Supp. 3d 252, 262-63 (E.D.N.Y. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)); see also Cash v. Cty. of Erie, 654 F.3d 324, 341-42 (2d Cir. 2011) (equating "moving force" with "proximate cause").

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.'" Cowan v. City of Mt. Vernon, 95 F. Supp. 3d 624, 643 (S.D.N.Y. 2015) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)). Importantly, this element "can only be satisfied where a plaintiff proves that a 'municipal police of some nature caused a constitutional tort.'" Roe, 542 F.3d at 36 (citation omitted). However, a "municipal policy may be pronounced or tacit and reflected in either action or inaction." Cash, 654 F.3d at 334; see also Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) ("The policy or custom need not be memorialized in a specific rule or regulation.").

"Accordingly, a plaintiff may satisfy this fifth element with evidence of: '(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly

authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.'" Benacquista v. Spratt, 217 F. Supp. 3d 588, 599-600 (N.D.N.Y. 2016) (quoting Cowan, 95 F. Supp. 3d at 637)).

Carter's operative complaint alleges that CMC has chosen to engage in a pattern of providing inadequate or substandard medical services at the various correctional facilities it manages as a cost savings measure. Among other things, plaintiff's complaint details a pattern of instances in which CMC's employees repeatedly provided various forms of inadequate medical care at other correctional facilities that resulted in a series of inmate deaths. Layered on top of this past history of misconduct is the allegedly inadequate medical care that CMC's employees repeatedly provided to Barton during his time at the Jail. At this early stage of the proceedings, these allegations are sufficient to state a Monell claim. See D'Agostino v. Montgomery County, 2012 WL 425071, at *4 (E.D. Pa. Feb. 9, 2012) (denying CMC's motion to dismiss Monell claim based on allegations that certain contractual financial incentives resulted in inadequate medical care).

Notably, however, Carter does not appear to be pressing supervisory liability claims against the individual CMC defendants, who are not alleged to have been personally involved in any of the incidents at the Jail. See Burwell v. Payton, 131 F. Supp. 3d 268, 302 (D. Vt. 2015) ("Supervisory liability is a concept distinct from municipal liability, and is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates."). Accordingly, to the extent

plaintiff's complaint might be construed as asserting individual-capacity § 1983 claims against President Umar and CEO Carpio, those claims must be dismissed.

## IV. **CONCLUSION**

"[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999). Carter has done so here.

Therefore, it is

ORDERED that

1. The medical defendants' motion to dismiss is GRANTED in part and DENIED in part;

2. The CMC defendants' motion to dismiss is GRANTED in part and DENIED in part;

3. The Eighth Amendment claim against LMSW Claire, LMSW Fenescey, and LMSW Shute in their individual capacities pleaded in the First Cause of Action is DISMISSED;

4. The Eighth Amendment claim against President Umar and CEO Carpio in their individual capacities pleaded in the Third Cause of Action is DISMISSED;

5. The Eighth Amendment claim against Doctor Butt and Doctor Tinio pleaded in the First Cause of Action REMAINS;

6. The Second Cause of Action REMAINS against the Does;

7. The Eighth Amendment claim against CMC pleaded in the Third Cause of Action REMAINS;

8. The Fourth Cause of Action REMAINS against all defendants;

9. The Fifth Cause of Action REMAINS against the medical defendants;

10.  The Sixth Cause of Action REMAINS against the Broome County defendants; and

11.  The medical defendants and the CMC defendants shall file and serve an ANSWER to Carter's operative complaint on or before October 13, 2017.

The Clerk of the Court is directed to terminate all pending motions.

IT IS SO ORDERED.

Dated:  September 29, 2017
         Utica, New York.

_____
United States District Judge